**GIANT BRANDS, INC. and Giant of Maryland LLC Plaintiffs,**

v.

**GIANT EAGLE, INC., and PHOENIX INTANGIBLES HOLDING CO. Defendants.**

No. CIV.A. AW–02–320.

United States District Court, D. Maryland, Southern Division.

Sept. 24, 2002.

Christopher R. Mellott, Elizabeth Marzo Borinsky, Roger W. Titus, William D. Co-

ston, John Henry Lewin, Jr., Esquires, Venable Baetjer and Howard, Baltimore, MD, Harvey Freedenberg, Alan R. Boynton, Jr., Esquires, McNees Wallace and Nurick LLC, Harrisburg, PA, for Plaintiffs.

Robert L. Allman, II, James S. Larrimer, Bernard D. Marcus, James F. Rosenberg, Esquires, Marcus and Shapira LLP, Pittsburg, PA, Chan PArk, Akin Gump Strauss Hauer and Feld, LLP, McLean, VA, for Defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Pending before the Court are three motions: (1) Plaintiffs' Motion for Preliminary Injunction [5–2]; (2) Defendants' Motion to Join Ahold USA Holdings, Inc., Ahold, IP, Inc., and Giant Foods, LLC as Party Plaintiffs [27–1]; and (3) Plaintiffs' Motion in Limine to Exclude Report and Testimony of Donald Dennison [41–1]. The Court held a hearing on the preliminary injunction and the related matters on June 3, 2002 and 5, 2002. *See* D. Md. R. 105(6).

During the hearing, and for the reasons stated on the record, the Court denied as moot Defendants' Motion to Compel Plaintiffs to Produce Documents Relating to "Giant Logo" and "Giant Brand" Initiatives [28–1]; Defendants' Motion for Expedited Briefing Schedule [29–1]; and Defendants' Motion for Ruling on Previously Filed Motion to Compel [29–2]. In addition, the Court denied Defendants' Motion to Exclude Expert Report and Testimony on Dr. Jacob Jacoby [32–1].

Following the hearing, the parties submitted post-hearing findings of fact and conclusions of law. The Court has reviewed the post-hearing documents and considered the evidence and arguments presented during the June 2002 hearing. For the reasons stated below, the Court will deny Plaintiffs' Motion for Preliminary Injunction, deny Defendants' Motion to Join the various Ahold parties, and deny as moot Plaintiffs' Motion in Limine regarding Donald Dennison.

## BACKGROUND

### 1. Summary

This case arises out of a trademark dispute between Plaintiffs Giant Brands, Inc. and Giant of Maryland LLC (collectively "Giant") and Defendants Giant Eagle, Inc. and Phoenix Intangibles Holding Co. (collectively "Giant Eagle"). Plaintiffs and Defendants are in the retail grocery business and each have had registered trademarks for their respective business for many years. Plaintiffs operate retail grocery stores and merchandising services under Giant Trademarks in Maryland, Virginia, and the District of Columbia. Defendants operate grocery stores under Giant Eagle Trademarks in Pennsylvania, Ohio, and West Virginia. Defendants have recently purchased a chain of six County Market supermarkets and plan to use the Giant Eagle Trademarks in the new stores, four of which are located in Maryland. Plaintiffs believe that Defendants' use of the Giant Eagle Trademark in Maryland will confuse and deceive consumers and thereby irreparably harm their exclusive right to Giant Trademarks in its Maryland territories.

Plaintiffs filed suit on January 29, 2002, seeking a temporary restraining order and preliminary injunction pending trial on the merits to prevent Defendants from using or promoting the Giant Eagle Trademark in Maryland and to compel Defendants to retract or withdraw advertising and promotional materials related to the Giant Eagle Trademark in Maryland. Plaintiffs also filed a Verified Complaint in which they alleged the following Counts: (1) trademark infringement under the Lanham Act § 32(1)(a); (II) false description,

representation and designation of origin and unfair competition under the Lanham Act § 43(a); (III) common law trademark infringement; (IV) common law unfair competition; and (V) dilution under the Lanham Act.

## 2. Parties

Plaintiff Giant of Maryland ("Giant of Maryland") is a Maryland limited liability company that is in the business of operating retail grocery stores. Giant of Maryland is the progeny of Giant Food, Inc. ("Giant Food"), a company founded more than sixty (60) years ago. Giant Food first opened a Giant grocery store in Washington, D.C. in 1936. Pls.'s Ex. 51, Stipulation of Facts ("Stip.") ¶ 3. Today, there are more than 175 retail grocery stores in Maryland, Virginia, and the District of Columbia operating under the GIANT banner. See id. The mark Giant Food was first registered with the United States Patent and Trademark Office on November 29, 1977. The first date of use is February 5, 1936. See id. Stip. ¶¶ 4, 13.

Plaintiff Giant Brands, Inc., is a Delaware corporation that owns the Giant name and marks at issue in this case.[1] See id. Stip. ¶ 13. Giant Brands, Inc. is wholly-owned by Ahold USA Holdings, Inc. Giant Brands, Inc. licenses the marks to Ahold IP, Inc., which in turn licenses them to Giant of Maryland. In 1998, Ahold USA Inc., acquired a predecessor to Giant of Maryland, LLC. Giant of Maryland LLC also is presently owned by Ahold USA Holdings. See id. Stip. ¶¶ 13, 14.

Defendant Giant Eagle is a privately-held Pennsylvania corporation that began using Giant Eagle on its grocery stores in 1933. Today, Giant Eagle operates 212 retail grocery stores in Pennsylvania, Ohio, West Virginia, and Maryland. Pls.'s Ex. 51, Stip., ¶ 15. Prior to this year, 208 of Giant Eagle's grocery stores were located in western and central Pennsylvania, Ohio, and West Virginia. Id. In February 2002, Giant Eagle opened four stores in Maryland. See Hr'g Tr., Karet, at 170–71. The mark "Giant Eagle" was registered on July 24, 1984. The first use of the mark was in 1933 and is still in use today. See id., Stip. ¶ 16.

Defendant Phoenix Intangibles Holding Company is a Delaware corporation, partially owned by Giant Eagle, Inc., which owns all of the GIANT EAGLE marks at issue in this litigation and licenses the use of said marks to Giant Eagle, Inc.[2]

---

1. The Giant marks include: (1) "Giant Food" (Registration No. 1,078,672), registered on November 29, 1977. The date of first use is February 5, 1936, and the mark is still in use; (2) "GGiant" (Registration No. 1,085,784), registered on February 14, 1978. The date of first use is February 12, 1964, and the mark is still in use; (3)"Giant Pharmacy" (Registration No. 1,129,400), registered on January 15, 1980. The date of first use is January 29, 1966, and the mark is still in use; (4) "GGiant" (Registration No. 1,337,159), registered on May 21, 1985. The date of first use is August 25, 1984, and the mark is still in use; (5) "Giant Discount Drug" (Registration No. 1,348,729), registered on July 9, 1985. The date of first use is June 24, 1984, and the mark is still in use; (6) "Giant" (Registration No. 1,406,293), registered on August 19, 1986. The date of first use is February 6,

1936, and he mark is still in use; (7) "Giant Food & Drug" (Registration No. 2,182,028), was registered on August 18, 1998. The date of first use is September 9, 1996, and the mark is still in use; (8) "GGiant" (Registration No. 2,182,027), registered on August 18, 1998. The date of first use is September 9, 1996, and the mark is still in use; (9) "Fresh Ideas Great Values" (Registration No. 2,313,915), registered on February 1, 2000. The date of first use was September 13, 1998, and the mark is still in use. Pls.' Ex. 51, Stip. ¶¶ 4–12.

2. The Giant Eagle marks include: (1) "Giant Eagle (and design)" (Registration No. 1,298,171), registered on September 25, 1984, and is still in use; (2) "Giant Eagle" (Registration No. 2,140,775), registered on March 3, 1998,

### 3. Factual and Procedural Background

In late December 2001, Giant Eagle purchased six County Market supermarkets, four of which were located in the State of Maryland. The other two stores were located in Pennsylvania. In February 2002, Giant Eagle converted the stores into Giant Eagle stores. Hr'g Tr., Karet, at 170. Plaintiffs Giant of Maryland and Giant Brands, Inc. objected to the use of the Giant Eagle name and marks in the State of Maryland and filed the instant lawsuit claiming, *inter alia*, trademark infringement. Plaintiffs contend that, because the Giant Eagle name and marks include the common descriptive word "Giant," the public will be misled to believe that Giant Eagle has a business relationship with Giant of Maryland.

Giant Eagle was founded in the early 1900s by four Pittsburgh families as a private grocery chain which was initially called Eagle Markets. From 1900 to 1929, the four families built a profitable chain of smaller grocery stores that they then sold to Kroger in 1929. Following the expiration of a non-compete covenant with Kroger, the families re-entered the supermarket business, but increased the size of their prototype store to 30,000 square feet and changed the name to Giant Eagle.

Starting in the 1960s, Giant Eagle embarked on an expansion plan during which it obtained a significant presence in central Pennsylvania, southeastern Ohio and northern West Virginia. *Id.*, Karet, at 170. In addition to its retail operations, Giant Eagle is also engaged in the wholesale food distribution business pursuant to which it produces and sells its own Giant Eagle private label line of food and grocery products in its stores. *Id.*, Karet, at 171–74.

In December 2001, Giant Eagle publicly announced that it had signed an agreement to purchase six County Market grocery stores, four of which were located in Maryland and two of which were located in Pennsylvania. The County Market stores in Maryland were located in Frederick (two stores), LaVale and Hagerstown. One store in Frederick is located on West Patrick Street, adjacent to a Giant store.

By letter dated January 7, 2002, counsel for Giant of Maryland informed Giant Eagle that there would be a likelihood of confusion between the Giant and Giant Eagle name and marks and demanded that Giant Eagle not convert the four Maryland County Market stores to Giant Eagle stores. Pls.'s Ex. 31, Letter from Michael Doctrow to Rick Russell. On January 17, 2002, David Radack, trademark counsel for Giant Eagle, sent a response in which he disagreed with the assertion that the use of the Giant Eagle name and marks in Maryland would create a likelihood of confusion due to the fact that the marks were dissimilar, different in appearance, and different in sound and meaning. Defs.'s Ex. QQ, Letter from David Radack to Michael Doctrow. Moreover, Mr. Radack noted that the Giant Eagle mark had been registered by the USPTO subsequent to the registration of the Giant mark and that, therefore, the USPTO examiner found no likelihood of confusion between the two marks. *See id.*

On January 29, 2002, Giant of Maryland filed a Complaint in this Court asserting that Giant Eagle's use of the Giant Eagle

and still in use; (3) "Giant Eagle & Design" (Registration No. 2,140,776), registered on March 3, 1998, and still in use; (4) "Giant Eagle" (Registration No. 2,521,719), registered on December 25, 2001, and still in use; (5) "Rx Giant Eagle Pharmacy" (Registration No. 1,323,818), registered on March 5, 1985, and still in use; (6) "Giant Eagle Advantage Card" (Registration No. 1,949,612), registered on January 16, 1996, and still in use. Pls.' Ex. 51, Stip. ¶¶ 17–22.

name and marks in Maryland would infringe on Giant's trademarks and seeking to enjoin Giant Eagle from opening the four Giant Eagle stores in Maryland. The following day, Giant moved for a temporary restraining order, claiming that the opening of the stores as Giant Eagle stores would cause Giant "immediate and irreparable harm." The Court held a conference call on the matter on February 1, 2002 and, by Opinion and Order dated February 4, 2002, denied Giant's TRO motion on the grounds that Giant was unlikely to suffer irreparable harm in the absence of the TRO and that Giant Eagle would suffer significant harm if the TRO were entered. *See Giant Brands v. Giant Eagle*, No. AW–02–320, slip op. (D.Md. Feb. 4, 2002) (opinion and order denying temporary restraining order motion). The Court also scheduled the preliminary injunction hearing for February 26, 2002. The Court later moved the date of the hearing at the Plaintiffs' request to give the parties a period of operations in which confusion or lack thereof could be assessed.

Beginning February 10, 2002, Giant Eagle converted the County Market stores to Giant Eagle stores. Giant Eagle retained virtually all of the County Market employees and retained the County Market format with the exception of replacing the signage inside and outside of the stores Hr'g Tr., Karet, at 192.

## *DISCUSSION*

### 1. **Motion for Preliminary Injunction**

#### a. **Standard of Review**

■ A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir.2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir.1991)). Under Fourth Circuit law, in

order to obtain a preliminary injunction, a plaintiff must meet the well-settled test of *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977). Under *Blackwelder*, the Court considers four factors: (1) the likelihood of irreparable harm to plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to defendant if the injunction is granted; (3) the likelihood that plaintiff will succeed on the merits; and (4) the public interest. *Id.* at 195–97.

The first step in the *Blackwelder* analysis is for the Court to employ the "balance of hardships" test to evaluate the " 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant." *Id.* at 195. "[I]f a *decided* imbalance of hardship should appear in plaintiff's favor, then . . . . it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* (citations omitted).

The district court then considers the likelihood of the plaintiff's success on the merits and whether granting the request is in the public interest. *Id.* at 196 (citing *Airport Comm. of Forsyth Co., N.C. v. CAB*, 296 F.2d 95, 96 (4th Cir.1961)). "The importance of probability of success increases as the probability of irreparable injury diminishes, and where the latter may be characterized as simply 'possible,' the former can be decisive." *Id.* "[E]ven a 'possible' irreparable injury has been held to suffice if there is strong probability of success on the merits." *Id.* at 196.

#### (1) **Balance of the Hardships**

■ In the case at hand, Plaintiffs claims that without a preliminary injunction, they will suffer irreparable injury via economic costs associated with keeping the

Giant name in consumers' minds through advertising and promotion. Hr'g Tr., Hancock at 110–11. In addition, Plaintiffs fear that shoppers will inadvertently shop at Giant Eagle thinking that it is Giant and might be disappointed as a result. Pls.'s Post–Hr'g Findings of Fact and Conclusions of Law at 24, ¶ 10. On the flip side. Defendants argue that their potential loss also would be great—an incalculable loss of goodwill associated with the Giant Eagle name and harm related to losing economies of scale associated with developing a single chain of Giant Eagle stores (e.g., fixtures, equipment, promotions). Defs.'s Proposed Findings of Fact and Conclusions of Law at 27, ¶ 6.

The Court is not convinced that the balance of the hardships favors Plaintiffs; rather, the hardships appear to present two sides of the same coin. *See MicroStrategy*, 245 F.3d at 339. Giant is a well-known and ubiquitous name in Maryland, while Giant Eagle is only just beginning its entry into the retail grocery market. The potential losses to Giant Eagle are persuasive. Therefore, the Court will examine the remaining *Blackwelder* factors to determine if a preliminary injunction is warranted.

### (2) Likelihood of Success on the Merits

"When, as here, the balance of the hardships 'does not tilt decidedly in the plaintiff's favor' then a plaintiff must demonstrate a 'strong showing of likelihood of success' or a 'substantial likelihood of success' by 'clear and convincing evidence' in order to obtain relief." *Id.* at 340. In trademark cases, the Fourth Circuit has held that a plaintiff's burden may be greater such that the "plaintiff must prove the 'probability (not mere possibility)' " of success on the merits; in other words, the plaintiff must have 'a very clear and strong case.' " *Id.* (quoting *Direx*, 952 F.2d at 813)). Thus, " 'if there is doubt as to the

probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied."

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects registered and unregistered marks against the use of any word, term, symbol or mark that is likely to confuse consumers about the origin of the marks. To establish its Lanham Act claim, Giant must show (1) it has a valid, protected trademark and (2) that the defendant's use of a similar trademark is likely to cause confusion among consumers. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir.1995). The parties agree that the Giant marks are valid, legally protected marks. Pls.'s Ex. 51, Stip. ¶¶ 4–12. The likelihood of confusion inquiry centers on whether the defendant's use of a colorable imitation of the trademark is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §§ 1114(1), 1125(a)(1). In order to determine whether there is a likelihood of confusion over the mark, Fourth Circuit courts look to seven factors:

a) the strength or distinctiveness of the mark;

b) the similarity of the two marks;

c) the similarity of the goods/services the marks identify;

d) the similarity of the facilities the two parties use in their business;

e) the similarity of the advertising used by the parties;

f) the defendant's intent;

g) actual confusion.

*Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984). At the same time, a court need not weigh each of these factors equally; rather, the determination is made on a case-by-case basis. *See id.; Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 463 (4th Cir.1996); *Anheuser–*

*Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.1992) (noting that the *Pizzeria Uno* factors are a guide only—"a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion"—and that all factors are not always relevant in a given case). At the same time, the Fourth Circuit has said that the seventh factor, actual confusion, "is often paramount. When the plaintiff's mark is strong and the defendant's use of a similar mark 'has actually confused the public, our inquiry ends almost as soon as it begins."' *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir.2001).

(A) *Strength or distinctiveness of the mark*

■ Under section 2 of the Lanham Act, marks can be distinctive in two ways: "First, a mark is inherently distinctive if "[its] intrinsic nature serves to identify a particular source." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 1343, 146 L.Ed.2d 182 (2000). Word marks, such as Giant, are held to be inherently distinctive when they are " 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent). *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10–11 (2d Cir.1976)). Second, a mark can be distinctive when "it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.' " *Id.* at 211, 120 S.Ct. 1339 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).

Plaintiffs believe that due to Giant's expenditures of $40 million annually on advertising and promotions, plus $10 million in consumer education and programs, Giant has acquired a "remarkably strong mark in the region." Pls.'s Post–Hr'g

Mem. Law at 24; *see also* Hr'g Tr., Hancock at 110–11. Defendants concede that Plaintiffs have used the Giant mark for many years and may have acquired a secondary meaning to consumers, but believe that such secondary meaning "does not mean that the *scope* of the mark will encompass *all* use of this term for food products and services." Defs.'s Proposed Findings, at 30, ¶ 12. Defendants point out that consumers are exposed to numerous third party uses of the Giant mark such as "Green Giant," "Sun Giant," and "Giant Goldfish" and are not confused by the common use of the word "Giant." The Court agrees that Plaintiff has developed a strong mark in this area. As noted by Mr. Hancock, Giant's Vice President for Marketing, there are approximately 1.5 million Giant Bonus Card users in Maryland, and focus groups suggest that approximately 80% of consumers recognize Giant advertising. Hr'g Tr., Hancock, at 113–15. Such empirical evidence supports the notion the Giant mark is a strong one. However, strength of the Giant mark is but one factor that suggests likelihood of success on the merits.

(B) *Similarity of the Marks*

The second factor courts evaluate is the similarity of the marks. Plaintiffs believe that the similarities of the Giant and Giant Eagle marks are apparent upon visual inspection. Because both marks denote retail grocery stores, are presented in block lettering, and have the same color scheme. Plaintiffs believe that they impermissibly create "the same overall impression, when viewed separately." Pls.'s Post–Hr'g Mem. Law at 24 (quoting *Bridges in Orgs., Inc. v. Bureau of Nat'l Affairs, Inc.*, 1991 WL 220807 at *8 (D.Md. June 24, 1991) (citation omitted)). Plaintiff point out that the Giant and Giant Eagle marks appear on red background and white print, and that the pharmacy logos are similar in that

they both have a mortar and pestle with the store name in block letters. *See* Pls.'s Exs. 6, 38, 39, 46. In addition, Plaintiffs point to a slogan in a Giant Eagle brochure. "It Takes A Giant To Make Life Simple" as evidence of the similarity of the marks.

On the other hand, Defendants argue that the Giant Eagle mark is a composite mark containing "Giant" as a purely descriptive or disclaimed word and that "Eagle" is the dominant term that will determine whether customers are misled. Defs.'s Proposed Findings at 30–31, ¶ 13 (citing *Pizzeria Uno,* 747 F.2d at 1534; *Lone Star Steakhouse & Saloon,* 43 F.3d at 936). "Where a proposed mark consists of but two words, one of which is disclaimed, the word that is not disclaimed is generally regarded as the dominant or critical term in determining the distinctiveness or suggestiveness of the proposed mark." *Pizzeria Uno,* 747 F.2d at 1529–30. Laura Karet, Giant Eagle's senior vice president of marketing, testified that in its markets, Giant Eagle is commonly referred to as "The Iggle," "The Big Bird," and "The Eagle." Hr'g Tr., Karet, at 172. In pronouncing the name "Giant Eagle," the word "Giant" does not get more or different emphasis than "Eagle," and Giant Eagle is rarely, if ever, referred to as "Giant" for short.

Likewise, in developing the Giant Eagle formative family of marks, if the full mark is not going to be used, it is the "Eagle" part of the name that acts as the springboard of mark development, examples of which include the formation of the marks "Iggle" Video (Giant Eagle's video department) and "Eagle's Nest" (Giant Eagle's in-house child care facilities). *See id.* Where, as here, the vendor (Giant Eagle) constantly indicates, through repeated use of its distinctive house marks that the source of the products and services are different, the likelihood of confusion with competitors using similar formats is greatly reduced. *See Abercrombie & Fitch v. American Eagle Outfitters,* 280 F.3d 619, 647 (6th Cir.2002).

Defendants next note that the logos are actually dissimilar in that the Giant Eagle mark consists of a distinctive red shield logo, wherein the word Giant is on top of the word Eagle, with both words being equally sized and being contained in an ovalized rectangle. Pls.'s Ex. 6. Giant's mark, on the other hand, consists of a stylized large letter G on which is superimposed the word Giant, with the G and Giant designations contained in a square. *See id.*

Finally, as to Plaintiffs' argument about the "It Takes A Giant To Make Life Simple," Ms. Karet testified that Giant Eagle began using the slogan "It Takes A Giant To Make Life Simple" in 1992, and changed it before the acquisition of the County Market stores. Hr'g Tr., Karet, at 175–76. Specifically, beginning in April 2001, Giant Eagle began moving away from the old slogan and devised a new slogan, "Giant Eagle—Make Every Day Taste Better," well before Giant Eagle's move into the Maryland market.

Based on the above, the Court acknowledges that although there are some similarities between the Giant and Giant Eagle marks, the marks are not so similar as to create a likelihood of confusion among customers.

(C) *Similarity of the goods, services, facilities, and marketing of the marks*

The Court next considers factors related to the similarity of goods or services the marks identify, similarity of the facilities, and similarity of the marketing of the marks. Defendants concede that for the purposes of the preliminary injunction hearing, they have not argued or presented evidence to dispute that Giant and Gi-

ant Food offer similar goods and services, employ similar facilities to transact business, and use similar advertising. Defs.'s Proposed Findings at 29, ¶ 11. The testimony at the hearing supports this position.

Giant and Giant Eagle marks identify very similar goods or services, i.e., retail grocery stores. Both stores have deli, meat, flower, produce, and prepared food departments, and that each store carries its own corporate brand. Hr'g Tr., Ellsworth, at 87; Hr'g Tr.,Karet, at 173. In addition, both stores are actively involved in their communities through sponsorships. Hr'g Tr., Hancock, at 110–11; Hr'g Tr., Ellsworth, at 87, Hr'g Tr., Karet, 184–86. Finally, both stores use customer or curtesy cards and seek to provide friendly and courteous service to customers. As for advertising, both stores use newspapers, radio, and television advertising. Hr'g Tr., Hancock, 112–13; Hr'g Tr., Karet, at 184.

These similarities demonstrate commonalities of many retail grocery stores. For example, although Mr. Ellis testified for Plaintiffs that the layout of the Pittsburgh Giant Eagle and Giant stores were similar, *see* Hr'g Tr., Ellis, at 83–85, Ms. Karet noted that it was not unusual for grocery stores to have similar layouts, as the stores all have the like goal of making customers' shopping trips as easy as possible. Hr'g Tr., Karet, at 191–92.

### (D) *Giant Eagle's Intent*

The next factor the Court examines is the intent of Giant Eagle. "If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc. to resemble the other so as to induce confusion." *Pizzeria Uno*, 747 F.2d at 1535. Plaintiffs argue that Giant Eagle both deliberately entered Giant's market and also began using Giant's "Fresh Ideas Great Values" slogan on its receipts. Pls.'s Post–Hr'g Mem. Law at 27; Pls.'s Ex. 20.

At the hearing, evidence was proffered demonstrating that Giant Eagle used the slogan as part of a larger sentence on its receipts—"Spring is here! Shop Giant Eagle for fresh ideas and great values every day." Pls.'s Ex. 20. However, Giant Eagle discontinued use of the phrase as soon as it learned of the Giant's trademark of the phrase. Hr'g Tr., Karet, at 181. Plaintiffs suggest that Giant Eagle "usurped" this phrase. Given that the phrase was used as part of a longer sentence and not as stand-alone slogan as used by Giant, and that Giant Eagle discontinued use of the phrase as soon as the conflict was discovered, the Court does not believe that this constitutes intent on the part of Giant Eagle.

As to Plaintiffs' argument that Giant Eagle deliberately entered its market in Maryland, there is simply no evidence to support this proposition. Although a small, privately-held company, Giant Eagle has been expanding steadily throughout Ohio, Pennsylvania, and West Virginia since the 1960s. Based on the evidence, Giant Eagle's move into Maryland appears consistent with its recent pattern of growth, not a result of Giant Eagle's intent to capitalize on Giant's mark.

### (E) *Actual confusion*

Actual confusion is the final and most important *Pizzeria Uno* factor used to determine likelihood of confusion. *Lyons P'ship, L.P.*, 243 F.3d at 804. This is so for the obvious reason that if there is evidence of substantial actual confusion or, on the other hand, evidence that there is no substantial actual confusion, such evidence will often by itself answer the question as to whether there is a "likelihood of confusion," between the two marks at is-

sue. *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992) (lack of evidence of actual confusion, along with dissimilarities in marks, was sufficient to establish that there was no likelihood of confusion under the *Pizzeria Uno* analysis). During the hearing, both sides presented quantitative evidence of likelihood of confusion via expert surveys. In addition, the parties provided qualitative evidence of actual confusion based on information gathered during Giant Eagle's four months of operation in Maryland.

In *Sara Lee Corporation v. Kayser–Roth Corporation*, 81 F.3d 455 (4th Cir. 1996), the Fourth Circuit noted that a survey estimate finding 15% confusion of similarity in marks would demonstrate actual confusion to a significant degree. *Id.* at 467. On the other hand, the court suggested that "survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent." *Id.* n. 15 (citing *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir.1983)). In addition, while "[a]ctual confusion can be demonstrated by survey evidence, . . . survey evidence is not necessarily the best evidence of actual confusion and 'surveys are not required to prove likelihood of confusion.'" *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654 (4th Cir.1996).

In this case, Giant introduced evidence of confusion from its expert, Dr. Jacob Jacoby, who conducted a survey to determine whether there was likely confusion as to source, business relationship, or permission to use a mark between Giant Eagle and Giant. In Dr. Jacoby's study, over 400 consumers participated at three different sites in Frederick and Columbia, Maryland, and in Springfield, Virginia. Approximately half the participants constituted a test group and were shown Giant Eagle communications, while the other half were the "control" group, having been shown similar communications but with the store name Great Eagle in order to weed out confusion not actionable under the Lanham Act. Averaged across the three sites, Dr. Jacoby determined that the likely confusion is approximately 30%, which he described as significant marketplace confusion.

On the other hand, Defendants' expert, Mr. Philip Johnson, designed and conducted his own survey in which over 1,000 customers at the four Giant Eagle stores in Maryland were interviewed upon exiting the store. Mr. Johnson also conducted his survey by applying recognized market survey procedures for exit interviews. The survey results project a level of likelihood of confusion of approximately 6%.

Defendants argue that because Dr. Jacoby's survey was fatally flawed, it is entitled to little or no weight. Defendants contend that Dr. Jacoby's survey was deficient in at least the following ways: (a) the Squirt survey design Jacoby used was biased because it is a test designed used for marks that are not well-known, and Giant is a well-known mark in this region; (b) the questions proposed were leading and biased; and (3) the results were not properly classified due to an inappropriate classification criteria. Hr'g Tr., Johnson, 271–91. Defendants' expert, Mr. Johnson, reanalyzed the responses to Dr. Jacoby's study and found that "there is some evidence that at a very low level there is some confusion, but it appears to be less than one percent based on the store incidences, and certainly falls in an area under 10 percent, based on the survey estimates." Hr'g Tr., Johnson, at 290–91.

As expected, Plaintiffs likewise criticize Mr. Johnson's methodology for using established Giant Eagle shoppers to measure likelihood of confusion over the Giant mark and for his approach in reviewing Dr. Jacoby's study. Plaintiffs contend that Mr.

Johnson's study: (a) used an improper universe of respondents; (b) improperly counted the respondents who answered "Giant" as meaning "Giant," not Giant Eagle; and (c) failed to follow up with on responses with "what makes you say that." Notwithstanding, Plaintiffs argue that Mr. Johnson's flawed study found 8% actual confusion in Frederick, Maryland, thus demonstrating enough confusion to suggest a likelihood of success on the merits. Pls.'s Post–Hearing Mem. Law at 17. In addition, Plaintiffs argue that using Dr. Jacoby's data with Johnson's coding suggests 18.9% confusion among consumers.

Finally, Giant of Maryland offered the testimony of a marketing expert, Dr. Stephen Hoch, who opined on several theories relating to likelihood of confusion. Again, Defendants' expert, Mr. Johnson, found Mr. Hoch's theories problematic as they were primarily theoretical with no connection to the survey research and external information in the case. Accordingly, Defendants believe Mr. Hoch's expert report is also entitled to little or no weight. Hr'g Tr., Johnson, at 291.

In addition to the quantitative analyses provided by both sides, the parties also provided qualitative data that suggested some level of confusion. For Plaintiffs, Kimberly Ellsworth, the General Manager for the West Patrick Street Giant, testified that, in anticipation of the preliminary injunction hearing, she was told to maintain a log at her store to record all instances of potential customer or vendor confusion. Ms. Ellsworth further testified that she repeatedly instructed all of her employees to record any instance of potential confusion and advised them that it was extremely important that all such incidents be documented in the log. Hr'g Tr., Ellworth, 98–100.

Ms. Ellsworth instituted the log no later than February 13, 2002, and maintained the log through May 31, 2002. A total of twenty-five incidents of potential confusion were recorded on the log. The majority of these instances took place shortly after the Giant Eagle store opened. Ms. Ellsworth testified about situations where customers arrived to pick up an order such as a birthday cake or prescription drugs only to find that the orders were placed at the Giant Eagle. Hr'g Tr., Ellsworth, at 91. She also testified about instances when vendors attempted to make deliveries at the wrong store, or when customers sought to redeem Giant Eagle coupons at the Giant store, *id.*, 92–95. Finally, Ms. Ellsworth testified about customer comments captured in the customer log include explicit questions about Giant's relationship to the new Giant Eagle.

Although these incidents of actual confusion seem persuasive at first glance, they must be viewed in context:

> Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight. "Given significant volume of sales, isolated instances of actual confusion may be disregarded as de minimis."

*See* McCarthy on Trademarks § 23:14 (4th ed.2002) (quotation omitted). In the case at hand, the Court believes that the actual confusion reported by Plaintiffs are *de minimis* in light of the vast number of daily transactions that occur at both Giant and Giant Eagle. On average, the potential customer confusion complaints averaged about I complaint out of every 4 days, or 12,000 customer transactions.

Thus, during the 108 days that the log was maintained (February 13, 2002 through May 31, 2002) there were approximately 324,000 transactions at the West Patrick Giant and only 25 recorded instances of potential confusion. Thus, even assuming that the log accurately portrays incidents of actual confusion, there is one (1) instance of alleged confusion for every 12,960 transactions (0.007%). Hr'g Tr., Ellsworth, at 100–05.

In addition, the evidence also reflects that not all of the incidents set forth in the log likely involved actual confusion on the part of the customer or vendor. Indeed, Ms. Ellsworth testified that she had first-hand knowledge of only three of the 25 incidents that were recorded in the log, and she admitted that certain incidents contained in the logs may not have involved customer confusion at all. *Id.* at 102–04.

In addition, regarding the confusion over 150 Giant Eagle coupons presented at Giant in Frederick, Ms. Karet testified that Giant Eagle had mailed 140,000 such coupon books to Maryland residents, 60,000 of whom lived in or around the Frederick area. Again, even assuming that the presentation of Giant Eagle coupons at the Giant store represents actual confusion on the part of the customer, the evidence shows that there was only a small handful of customers that presented Giant Eagle coupons at the West Patrick Street Giant store out of the tens of thousands that visit the store during any particular week, and out of the 140,000 that received the coupon books. Hr'g Tr., Ellsworth, at 94–95; Hr'g Tr., Karet, at 194–95.

The lack of any significant confusion between the two companies was also reflected in the testimony of Philip McAllister, the manager of the West Patrick Street Giant Eagle store that is directly adjacent to the Giant store. Mr. McAllister had previously worked for County Markets and before that for the Martin's chain that is owned by Giant of Pennsylvania. He became the store manager for the County Market store in Frederick when it was converted from a Martin's store in 1998. Hr'g Tr., McAllister, at 327. Mr. McAllister testified that, for a period of time after the Martin's store was converted to a County Market store, the number of customers who mistakenly or intentionally presented a competitor's store loyalty card or a competitor's coupons increased. He stated that there was no discernable difference between the number of loyalty cards or coupons presented from one competitor versus other competitors. *Id.* at 328–30.

Mr. McAllister was the store manager of the West Patrick Street Giant Eagle store when it was converted from a County Market store in February, 2002. He testified that in December 2001, when it was first announced that Giant Eagle would take over the County Market store, he received customer inquiries regarding the proposed takeover of the store. According to Mr. McAllister, people asked him about a potential affiliation between Giant Eagle and Giant to confirm that the two entities were different and to confirm that the price structure at Giant Eagle would remain similar to that of County Markets and would remain lower than the price structure of Giant. *Id.* at 330–31.

Mr. McAllister also testified that after the store converted to a Giant Eagle store, it received an increase in the number of competitor cards and coupons that were presented similar to what had happened when the store had been converted to a County Market store in 1998. Mr. McAllister stated that Giant BonusCards and Giant coupons were presented no more frequently than other competitor coupons and cards at the Giant Eagle store after it

was converted in February 2002. *Id.*, at 332–34.

Based on the above, the Court finds that the amount of actual confusion is *de minimis* and does not suggest a likelihood of confusion on the part of consumers. Both statistical studies presented by the parties' experts presented on their own inherent weaknesses and biases. The in-store data collected by the parties demonstrates only a .01% potential confusion rate, and even at that, the rate decreased as in the period following the conversion from County Market to Giant Eagle. Furthermore, the Court does not believe that Plaintiffs have met their burden of demonstrating likelihood of success on the merits by a clear and convincing evidence. The Court acknowledges that this is a close case, but ultimately finds that despite some similarities in the Giant and Giant Eagle marks, the data and information now before the Court suggest that Plaintiffs do not have a likelihood of success on the merits.

### (3) Public Interest

The final *Blackwelder* factor that the Court must evaluate is the public interest. While the Court recognizes the policy behind the Lanham Act is to protect consumers from confusion, the Court also believes that evidence suggests that any potential consumer confusion has been *de minimis*. As a result, the Court believes that public interest supports allowing Giant Eagle to continue its business and to bring increased competition to Maryland's retail grocery stores. The Court notes that Giant Eagle has thus far monitored and contained its advertisements and promotions in light of the current litigation.

Based on the foregoing, the Court will deny Plaintiffs' motion for preliminary injunction. Not only have Plaintiffs failed to show that the balance of hardships tilts decidedly in their favor, but further analysis under the *Blackwelder* test demon-strates that Plaintiffs have failed to establish by clear and convincing evidence that there is a likelihood of success on the merits, or that the public interest favors their claims. As a result, the Court will deny the motion.

### b. Defendants' Defense of Unclean Hands

As a defense to any alleged claim of trademark infringement, Defendants argue that Plaintiffs and their related Ahold entities, Giant of Pennsylvania and Ahold USA, have acted in a manner inconsistent and at odds with Plaintiffs' claim. Nonparty Giant Food Stores, LLC ("Giant of Pennsylvania") is a sister corporation to Giant of Maryland and also operates retail grocery stores under the Giant banner in Pennsylvania, Maryland, Virginia, and West Virginia. Giant of Pennsylvania is licensed to use the Giant name and marks through Ahold IP, Inc.

Plaintiffs Giant of Maryland and Giant Brands, Inc., along with Giant of Pennsylvania, are all wholly-owned subsidiaries of Ahold USA Holdings, Inc. and are part of the family of supermarket chains owned and controlled by Royal Ahold, N.V. ("Ahold"), a Netherlands corporation that is one of the top five largest supermarket companies in the world with approximately $66 billion in annual sales. *See* Hr'g Tr., Ellis, at 61–63.

Defendants argue that the Ahold entities have a "unity of control" over and are a single source for the Giant marks at issue in this litigation. Furthermore, Defendants argue that Ahold USA, Giant and Maryland, and Giant of Pennsylvania have teamed up to implement a Giant Logo Initiative whereby a common label would be used by both Giant of Maryland and Giant of Pennsylvania. *See* Pls.'s Ex. 9. Defendants therefore argue that Plaintiffs are seeking equitable relief based on a

likelihood of confusion between the Giant and Giant Eagle marks while at the same time. Plaintiffs and the Ahold entities are promoting Giant name and marks in direct competition in Giant Eagle in Pennsylvania.

Although there may be merit to Defendants' argument, the Court has already decided that a preliminary injunction is inappropriate based on an analysis of the likelihood of success and the other *Blackwelder* factors. Therefore, the Court need not address this unclean hands defense now.

**2. Defendants' Motion to Join Ahold, USA, Inc., Ahold USA Holdings, Ahold IP, Inc., and Giant Food Stores, LLC as Party Plaintiffs**

Related to Defendants' unclean hands defense and pursuant to Federal Rule of Civil Procedure 19, Defendants move to join Ahold USA, Inc., Ahold USA Holdings, Inc., Ahold IP, Inc., and Giant Food Stores, LLC because each of these competitors either owns, controls, licenses or otherwise uses various Giant marks, including those Giant marks that are at issue in this litigation. For the reasons discussed in their unclean hands defense, Defendants maintain the Court should join the above-mentioned Ahold entities.

Rule 19(a) provides that:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

F.R. Civ. P. 19(a). In its motion, Defendants do not provide any convincing rationale as to why the Ahold parties should be joined other than to avoid inconsistent judgments and obligations among the parties. Defendants have not demonstrated why complete relief cannot be granted in the Ahold parties' absence, and Defendants' pleadings do not assert a claim or request relief against Giant or the Giant affiliates. Therefore, Defendants have not, at this time, established a need to join the Ahold entities. The Court will therefore deny this motion without prejudice to refile later in the litigation if necessary.

**3. Plaintiffs' Motion in Limine to Exclude Report and Testimony of Donald Dennison**

Finally, Plaintiffs filed a motion in limine to exclude to report and testimony of Donald Dennison, who was hired by Defendants to investigate the "unity of control" issue discussed above and to help clarify the factual underpinnings with respect to the trademark infringement claims. Plaintiffs object to Dennison's testimony on grounds that his findings are legal conclusions and are unsupported by evidence upon which he could based his conclusions.

The Court did not consider testimony from Mr. Dennison at the hearing and

because it has not evaluated the unclean hands defense, the Court will deny this motion as moot. If appropriate at a later junction, Plaintiffs may refile this motion.

## CONCLUSION

Based on the foregoing, the Court will deny Plaintiff's motion for preliminary injunction. While both sides present cogent arguments, the Court finds that Plaintiffs have failed to meet their burden under the *Blackwelder* test. In addition, the Court will deny without prejudice Defendants' motion to join the Ahold entities and will deny as moot Plaintiffs' motion to exclude the report and testimony of Donald Dennison. An Order consistent with this Memorandum Opinion will follow.

## *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, IT IS this 24th day of September, 2002, in the United States District Court for the District of Maryland ORDERED THAT:

1. Plaintiff's Motion for Preliminary Injunction [5–2] BE, and the same hereby IS, DENIED;

2. Defendants' Motion to Join Ahold Entities [27–1] BE, and the same hereby IS, DENIED without prejudice;

3. Defendants' Motion to Compel Plaintiffs to Produce Documents Relating to "Giant Logo" and "Giant Brand" Initiatives [28–1] BE, and the same hereby IS, DENIED AS MOOT;

4. Defendants' Motion for Expedited Briefing Schedule [29–1] BE, and the same hereby IS, DENIED AS MOOT;

5. Defendants' Motion for Ruling on Previously Filed Motion to Compel [29–2] BE, and the same hereby IS, DENIED AS MOOT;

6. Defendants' Motion to Exclude Expert Report and Testimony on Dr. Jacob Jacoby [32–1] BE, and the same hereby IS, DENIED;

7. Plaintiffs' Motion to Exclude Report and Testimony of Donald Dennison BE, and the same hereby IS, DENIED AS MOOT; and

8. The Clerk of the Court transmit copies of this Memorandum Opinion and Order to all counsel of record.