DICLERICO, District Judge,
concurring in the judgment.
Although I agree that the preliminary injunction was erroneously issued and must be vacated, I respectfully disagree with the majority’s reasoning in reaching that conclusion. We agree on the basic standard for determining infringement, which requires proof that: (1) the asserted trademark is entitled to Lanham Act protection, and (2) “the allegedly infringing use is likely to result in consumer confusion.” Borinquen Biscuit, 443 F.3d at 116. We agree that “duck tours” is a commonly used phrase that means amphibious sightseeing excursions. We also agree that because “duck tours” is a commonly used phrase and is shared by both of the trademarks at issue in this case, that phrase is insignificant in determining whether the marks are likely to cause consumer confusion.
I part company with the majority, however, because the majority separately classifies the phrase “duck tours” as a generic phrase and uses that analysis to conclude that the asserted mark, BOSTON DUCK TOURS, lacks strength, making consumer confusion unlikely. In so doing, the majority has conflated the first and second elements of the trademark infringement standard, which in my opinion should be treated separately. I write separately to explain my conclusion that the preliminary injunction must be vacated.
I.
It is important to begin with a brief review of the procedural history of this case and the posture in which it reached this court. In the district court, the parties agreed that BOSTON DUCK TOURS is a protected mark. The district court recognized this agreement and held, in its order granting the motion for a preliminary injunction, that “there is no challenge to the plaintiffs ownership of a protected mark,” Boston Duck Tours, LP v. Super Duck Tours, LLC, 514 F.Supp.2d 119, 124 (D.Mass.2007). Because the first element of the infringement claim was established, the court was not required to consider whether BOSTON DUCK TOURS is a protected mark. Therefore, the court properly turned to a consideration of the second infringement element, the likelihood of consumer confusion, and reviewed the evidence under the eight Pignons factors.
In support of its motion for a preliminary injunction, Boston Duck focused on the similarity of Super Duck’s mark and logo to its own, along with evidence of actual consumer confusion, to show a likelihood of success on its infringement claim. Super Duck responded that Boston Duck was not likely to prove infringement, primarily due to the weakness of its mark. *32 Super Duck argued that part of Boston Duck’s mark, the phrase “duck tours,” is generic and not entitled to Lanham Act protection. In response, Boston Duck argued that its mark, BOSTON DUCK TOURS, was protected and not generic.[32] Therefore, the parties in the first instance introduced the term “generic” into the analysis of the second element of infringement.
“Generic” is a term of art used as part of the classification analysis to determine whether a trademark is entitled to Lanham Act protection under the first element of trademark infringement.[33] If the asserted mark is entitled to protection, the second element of the infringement analysis focuses on whether the use of the allegedly infringing mark is likely to cause confusion with the protected mark. Borinquen Biscuit, 443 F.3d at 116. Following the lead of the parties, the district court conflated the two elements of an infringement analysis. After having stated that Boston Duck’s ownership of a protected mark, BOSTON DUCK TOURS, was not disputed, the district court nevertheless analyzed the phrase “duck tours” to determine whether it was a “generic mark,” when it considered the eighth Pignons factor, the strength of the mark.
In considering the eighth factor, the court noted that it was the cornerstone of Super Duck’s case and that Super Duck’s “argument hinges on the theory that the phrase ‘duck tours’ is a generic term and thus, not protectable regardless of any actual confusion or similarity of trademarks. As expected, the plaintiff vigorously disagrees.” Id. at 126. The court then considered whether the phrase “duck tours” was generic or whether it was protectable under the Lanham Act and concluded: “Although the Court is not convinced that ‘duck tours’ is a very strong mark it is, at least, not a generic mark. The Court declines to decide at this time whether it is descriptive, suggestive or arbitrary but even if it is a weak descriptive mark, there is persuasive evidence that it has acquired a secondary meaning in the Boston area during the past 13 years.” Id. at 127. The court concluded its analysis by finding that “duck tours” was not generic.
II.
In this case, however, “duck tours” is not claimed as a trademark at all. Boston Duck does not allege that Super Duck is infringing its right to the mark “duck tours.” Cf. Ty, Inc. v. Jones Group Inc., 237 F.3d 891, 897 (7th Cir.2001); Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 140 (4th Cir.2000); Boston Beer Co. Ltd. v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 179-83 (1st Cir.1993). Instead, Boston Duck asserts that Super Duck is infringing its registered mark, BOSTON DUCK TOURS, and its cartoon duck logo, by using a confusingly similar mark and logo.
The majority opinion analyzes the separate phrase “duck tours,” apart from the asserted mark “BOSTON DUCK TOURS,” and determines that the phrase “duck tours” is generic. The question of *33 whether a mark is generic or protected is one that is addressed in the first part of an infringement analysis. See Borinquen Biscuit, 443 F.3d at 116. Because the parties agreed that Boston Duck’s mark was protected, the first part of the infringement analysis has no place in this case. See id. Instead, the case turns on the second element, whether there is a likelihood of consumer confusion between Boston Duck’s mark and logo and Super Duck’s mark and logo, which is determined by applying the Pignons factors, not by considering whether part of a mark is entitled to trademark protection.
Furthermore, the “anti-dissection rule” instructs that composite trademarks, those with more than one word, are considered as a whole for purposes of determining a likelihood of consumer confusion. 3 McCarthy § 23:41. Therefore, when we apply the Pignons factors, “we look at ‘the total effect of the designation, rather than a comparison of the individual features.’ ” Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 4 (1st Cir.1993) (quoting Pignons, 657 F.2d at 487). Despite that rule, the district court and the majority opinion analyze the phrase “duck tours” as if it were a separately claimed mark apart from the mark as a whole. I disagree with that approach, which I believe is contrary to Boston Duck’s claim and to an infringement analysis that is supported by this circuit’s precedent.
In addition, Super Duck raised the question of whether “duck tours” is generic in the context of the eighth Pignons factor, the strength of the trademark. The parties and the district court then treated that issue as the “cornerstone” of the preliminary injunction analysis. The majority follows that path and analyzes the strength of “duck tours” in the context of the eighth Pignons factor.
In this circuit, however, the strength of a trademark is assessed based on “practical matters and not the legal classification of the mark.”[34] Attrezzi, 436 F.3d at 40. An argument that a mark is weak based on its legal classification between generic and arbitrary or fanciful “is not a proposition supported by any First Circuit case law and its logic is not apparent to us.”[35] Id. Although the majority attempts to distinguish the holding in Attrezzi from the circumstances in this case, I am not persuaded.
Other circuits determine the strength of a mark by considering both its “conceptual strength,” meaning where it falls along the legal classifications of distinctiveness from generic to fanciful, and its commercial strength. See, e.g., Ut. Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d 1045, 1056 (10th Cir.2008); Synergistic Int'l, LLC, v. Korman, *34 470 F.3d 162, 173-74 (4th Cir.2006). As Attrezzi explains, the second element of the infringement analysis, whether using the accused mark is likely to cause consumer confusion, requires consideration of real life, practical, marketplace evidence of the likelihood of confusion. 436 F.3d at 40. Where a mark is classified on the spectrum of distinctiveness is not evidence of the choices and decision-making that a consumer faces in the marketplace. Instead, the second element considers the actual use of the allegedly infringing mark and its likely effect on commerce. Therefore, I read Attrezzi as establishing an analytical framework that is different from that followed in other circuits and that distinguishes between the legal issue of a mark’s conceptual strength and the practical issue of its commercial strength.
III.
Despite the cited differences of opinion, I reach the same result under the following analysis.
A. Likelihood of Consumer Confusion—Pignons Factors
Trademark infringement requires proof that consumers are likely to be confused as to the source of the product they are buying. I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir.1998). The potential for confusion is measured by considering the Pignons factors:
(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties’ channels of trade; (4) the relationship between the parties’ advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant’s intent in adopting its mark; and (8) the strength of the plaintiffs mark.
Borinquen, 443 F.3d at 120 (citing Pig-nons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir.1981)). The eight factors provide guidance and may be given more or less weight depending on the particular circumstances of the case. Beacon Mut. Ins. Co. v. One-Beacon Ins. Group, 376 F.3d 8, 15 (1st Cir.2004).

1. Similarity of the Marks

The similarity of marks must be determined by comparing the total effect of each mark, not their separate parts. As-tra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir.1983). Nevertheless, if the most dominant feature of both marks is the same or similar, then that similarity may cause confusion. Beacon Mut., 376 F.3d at 18. Words that were disclaimed in the course of trademark registration ordinarily are not the dominant part of a composite word mark. See 4 McCarthy § 23:42; see also Country Floors, Inc. v. P’ship Composed of Gepner & Ford, 930 F.2d 1056, 1065 (3d Cir.1991); Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1530 (4th Cir.1984); Giant Brands, Inc. v. Giant Eagle, Inc., 228 F.Supp.2d 646, 653 (D.Md.2002). In addition, a logo or additional distinguishing features used with a mark may reduce the likelihood of confusion. Int’l Ass’n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 203 (1st Cir.1996).
SUPER DUCK TOURS and BOSTON DUCK TOURS both include the phrase “duck tours” which makes that part of the marks identical. Boston Duck disclaimed both “duck” and “tours” during the registration process and Super Duck disclaimed “duck tours.” In addition, the term “duck tours” is commonly understood to mean an amphibious sightseeing excursion. Therefore, “duck tours” should not be considered the dominant part of their marks.
*35 Instead, the marks’ first words are their most salient features. “Super” refers to the characteristics of the tour, while “Boston” suggests its geography. The overall impression, therefore, suggests a similar tour offered by different enterprises.
The logos reinforce the differences. Boston Duck’s logo consists of a white oval within which is a circle with a black border framing a yellow cartoon duck. The duck sits on blue water facing out directly from the center of the circle with a purple backdrop. Written around the top of the circle is the name BOSTON DUCK TOURS in uniform black lettering. The yellow cartoon duck wears a camouflage hat and is flapping its wings into water, causing the blue-and-white-tipped water to splash outside of the circle.
Super Duck’s logo is a blue oval with darker blue accents, denoting water. Toward the top of the logo, and getting smaller across the logo to suggest motion from left to right, the trade name SUPER DUCK TOURS is printed in orange. “SUPER” is the largest and most prominent feature of the mark as used in the logo. At the center of the logo is a duck tour vehicle with a cartoon duck head and wings on the front and a duck tail on the rear of the vehicle. The duck vehicle with its wheels depicted is moving from a black road into the water. On the front of the vehicle are the head and shoulders of a cartoon duck with an orange cape flowing behind and over the vehicle. With one of its two muscular wings, the duck is holding up an orange flag with the words “Charles-town, MA” on it. Passengers crowd together along the side of the duck vehicle, which has “Super Duck Tours” written on its side. As the duck vehicle enters the water, white water splashes into the air.
Although both logos show cartoon ducks, the ducks are used differently. Super Duck’s logo emphasizes its super hero theme and its new vehicle, while Boston Duck’s logo focuses on the duck’s head with a camouflage hat, a reference to the World War II vehicles used by Boston Duck. The obvious differences between the marks and logos strengthen the conclusion that they are not confusingly similar. If consumers viewed the marks and logos in the marketplace, without prior exposure to only Boston Duck’s mark and logo, they would not be confused.

2. Similarity of Services

The tour services offered by Boston Duck and Super Duck are similar, and the district court found them to be virtually identical. Super Duck does not challenge that part of the district court’s order.

S. Channels of Trade, Advertising, and Customers

The third, fourth, and fifth Pignons factors are often considered together. At-trezzi, 436 F.3d at 39. The parties do not dispute that they share channels of trade, customers, and advertising.

Ip. Actual Confusion

Evidence that consumers are actually confused by similar marks provides the best proof of the likelihood of future confusion. Id. at 40. Evidence of actual confusion, however, may be the result of external factors unrelated to the similarity of the marks. Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 320 (4th Cir.1992). While trademarks are intended to protect against unfair competition, they are not intended to perpetuate product monopolies. Id.
Boston Duck provided evidence that some consumers were confused when Super Duck began operations in Boston in the summer of 2007. Some consumers would buy tickets for Super Duck tours *36 and then arrive at Boston Duck’s departure sites for tours. Taken in the proper context, however, the confusion that has occurred between Super Duck and Boston Duck during the first few weeks of Super Duck’s operations in the Boston area was more likely caused by Boston’s Duck unique position during the thirteen years that it operated the only amphibious tour service in the Boston area.[36] As a result, Boston Duck has enjoyed a monopoly in that segment of the tour service industry in the Boston area. In contrast, if several amphibious tour services had been operating in the Boston area when Super Duck began operations, a duck tour would be less likely to be associated with a single company.[37]
Trademark laws, however, cannot be used to perpetuate a product monopoly if the competing trademarks are not otherwise confusingly similar. Because I conclude that Boston Duck’s and Super Duck’s marks and logos are not confusingly similar, I am unpersuaded by the evidence of actual confusion.

5. Intent

Whether the defendant acted in bad faith in adopting its mark is another factor to be considered in determining the likelihood of consumer confusion. Attrezzi, 436 F.3d at 40. Evidence that the defendant intended to take advantage of the plaintiffs reputation, goodwill, and promotion of its product by adopting a similar mark is probative of the likelihood of consumer confusion. Star Fin. Servs., Inc. v. AAS-TAR Mortgage Corp., 89 F.3d 5, 11 (1st Cir.1996). Evidence of the defendant’s good faith in adopting its mark, however, does not show that consumer confusion is unlikely. Id.
Boston Duck argues that Super Duck intended to trade off of Boston Duck’s goodwill by using SUPER DUCK TOURS as its mark. In support of that theory, Boston Duck contends that Super Duck was aware of Boston Duck’s trademark, its logo, and its associated reputation when it moved its operations from Portland, Maine to Boston. Those circumstances, Boston Duck asserts, support an inference of Super Duck’s bad faith.
The evidence shows, however, that Super Duck adopted its mark when it began operating in Portland six years before it moved to Boston. Boston Duck does not contend that use of the mark in Portland infringed its trademark. The circumstances here do not support an inference of bad faith.

6. Strength of the Mark

The last Pignons factor evaluates the relative strength of the marks based on practical considerations. Attrezzi, 436 F.3d at 40. Strength is measured by considering “the length of time the mark has been used, the trademark holder’s renown in the industry, the potency of the mark in the product field (as measured by the number of similar registered marks), and the trademark holder’s efforts to promote and protect the mark.” Borinquen, 443 F.3d at 121.
The evidence shows that Boston Duck Tours has used its trademark and logo since 1994. Super Duck began to use its mark seven years later, in 2001, in Portland, Maine. The first duck tour apparently began in Wisconsin just after World *37 War II. Indeed, Boston Duck acknowledges on its website that it is not the first or the only duck tour. Therefore, although Boston Duck has more longevity than Super Duck, Boston Duck was not the first duck tour nor is it apparently the longest running duck tour in the industry. Boston Duck demonstrates that it is renowned in the Boston area for its sightseeing tours. Its fame is due at least in part, however, to the position it has enjoyed as the only duck tour service in the Boston area. Boston Duck’s recognition in tour magazines and the awards it cites are focused on its unique Boston service. As such, the evidence does not show that Boston Duck has unusual renown in the industry as a whole, when compared to amphibious tours offered elsewhere.
The record evidence shows that many other amphibious vehicle sightseeing companies, outside of Boston, provide the same service, use the term “duck” or “duck tour” in their names or in describing their services, and show a cartoon duck in their logos.[38] Even Boston Duck’s means of conveyance, the World War II DUKWs, is not unique. The record also shows that other duck tour companies have applied to register names with the term “duck tours,” including Super Duck, and that other trademarks which include the term “duck tours” have been registered with the PTO.
Boston Duck protected its mark by registering its word mark and its logo with the PTO in 2002. Boston Duck represents that its declarations for use and ineontesti-bility of the mark were accepted by the PTO in July of 2007. In its registration, however, Boston Duck disclaimed the right to use the word “duck” and the word “tours” apart from its mark, BOSTON DUCK TOURS. Boston Duck states that it promotes its mark and logo by using them on its website, on its ticket sales booths, and on the tour vehicles.
Despite Boston Duck’s recognition in the Boston tour industry and its registration and promotion of its mark and logo, given the common use of the term “duck tours” to describe the service Boston Duck provides, BOSTON DUCK TOURS is not a strong mark.

7. Weighing the Pignons Factors

Although several of the pertinent factors for determining whether Boston Duck has shown a likelihood of consumer confusion between its mark and logo and Super Duck’s mark and logo are conceded, those that are contested, when viewed under the appropriate standard, weigh strongly against finding a likelihood of consumer confusion. Boston Duck Tours is not a strong mark, particularly because its reputation is built at least in part on having introduced the amphibious tour service to Boston and having been the only such tour in Boston for thirteen years. Duck tours, however, have been and continue to be available in other cities in this country and internationally.
Despite their shared use of the phrase “duck tours,” the overall impression of the Boston Duck and Super Duck marks and logos is that they are not similar. Although Boston Duck provided evidence of actual consumer confusion, such confusion is likely more the result of Boston Duck’s unique position in Boston rather than any *38 similarity in the marks and logos. Finally, the record does not support an inference that Super Duck adopted its name in bad faith to trade off of Boston Duck’s reputation. In sum, Boston Duck has not shown that it is likely to succeed on its infringement claim by showing a likelihood of consumer confusion between the marks and logos.
B. Injunction
Therefore, Boston Duck was not entitled to the injunction that was issued. New Comm Wireless Servs., 287 F.3d at 9.
APPENDIX
[[Image here]]

. When the party claiming infringement has registered its trademark on the Principal Register, a presumption arises that the mark is entitled to Lanham Act protection. Colt, 486 F.3d at 705. Further, when a mark has become incontestable, pursuant to 15 U.S.C. § 1065, as is the case here, registration is conclusive evidence that the mark merits protection. Park 'N Fly, 469 U.S. 189, 191-192, 105 S.Ct. 658, 83 L.Ed.2d 582.

. The classifications used to determine whether a mark is protected range along a spectrum of distinctiveness as follows: “(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.” Colt, 486 F.3d at 705.

. The practical matters pertinent to the strength of the mark include "the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff’s action in promoting the mark.” Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 547 (1st Cir.1995) (internal quotation marks omitted). The legal classification of trademarks, from generic to fanciful, is used in the first step of an infringement analysis, for determining whether a mark is protected under Lanham Act. Borinquen, 443 F.3d at 116-17.

. In contrast, other circuits do consider where a mark falls on the classification spectrum for purposes of determining the mark’s strength. See, e.g., Am. Rice, Inc. v. Producers Rice Mill, Inc., 518 F.3d 321, 330 (5th Cir.2008); Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1239-40 (11th Cir.2008); Banff, Ltd. v. Federated Dep’t Stores, Inc., 841 F.2d 486, 491 (2d Cir.1988). Because this circuit has rejected that analysis, we are bound by that precedent in the absence of intervening circumstances that would warrant a change. See, e.g., Amato v. United States, 450 F.3d 46, 53 (1st Cir.2006).

. The record also suggests that confusion may have been exacerbated by the company Super Duck hired to sell its tickets.

. For example, consumers would not confuse “Boston Pizza” with "Super Pizza” because they expect a variety of pizza businesses to co-exist.

. In fact, this is not the first dispute about similar services that has landed a duck tour company in court. See, e.g., Ride the Ducks of Phil. LLC v. Duck Boat Tours, Inc., 2005 WL 1583514 (3d Cir. July 6, 2005); City of Key West v. Duck Tours Seafari, Inc., 972 So.2d 901 (Fla.Dist.Ct.App.2007); Dells Boat Co., Inc. v. Village of Lake Delton, 2001 WL 1512763 (Wis.Ct.App. Nov. 29, 2001); Old South Duck Tours, Inc. v. Mayor & Aldermen of Savannah, 272 Ga. 869, 535 S.E.2d 751 (2000).